**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

**Theresa E. Peer,**                                            **CASE NUMBER:**

      **Plaintiff,**

v.

**Liberty Life Assurance Company of Boston,**

      **Defendant.**
_____/

**COMPLAINT**

    Plaintiff, Theresa E. Peer, ("Peer," below) makes this her Complaint against Defendant. Liberty Life Assurance Company of Boston, ("Liberty," below) and states as follows:

1.   **Jurisdiction.** This is a civil action arising under the laws of the United States pursuant to 28 U.S.C. Sect. 1331. Pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA," below), 29 U.S.C. Sect. 1001 *et seq.*, Peer brings this action against Liberty to for a disability-based waiver of group life premium benefit pursuant to 29 U.S.C. Sect. 1132(a)(1)(B). Peer further requests an award of costs, including an award of reasonable attorney's fees, pursuant to 29 U.S.C. Sect. 1132(g)(1).

2.   **Venue.** Peer is and has been a resident of Palm Beach County, Florida, lying within the Southern District of Florida. Venue is proper in the United States District Court for the Southern District of Florida, in which district the breach took place.

3.   **The Plaintiff.** Peer is a beneficiary of an employee welfare benefit plan providing a disability-based group life waiver of premium benefit to eligible participants and beneficiaries, as the terms "beneficiary" and "employee welfare benefit plan" are defined

respectively in ERISA at 29 U.S.C. Sect. 1002(8) and 1002(1).

4. **The Plan.** The plan is an "employee welfare benefit plan," as that term is defined in ERISA at 29 U.S.C. Sect. 1002(1), ("the Plan," below).

5. **The Plan Sponsor.** The "plan sponsor" of the Plan, as the term "plan sponsor" is defined in ERISA at 29 U.S.C. Sect. 1002(16)(B), is Novo Nordisk Inc.

6. **The Defendant.** Liberty provides benefits, including a disability-based benefit under a group life insurance policy (the "Policy," below) issued by Liberty.

7. **The Waiver of Premium Benefit.** The Policy describes the "Waiver of Premium For Total Disability" benefit in pertinent part as follows:

> "If a Covered Person becomes Totally Disabled while insured under this policy he may be eligible for continued Life Insurance coverage without premium payment, provided that:
>
> 1. he becomes Totally Disabled while insured under this policy and before age 60;
> 2. within one year from the date he is no longer in Active Employment Liberty receives initial Proof that his Total Disability has continued for 6 months (initial Proof); and
> 3. during the three months before each anniversary of receipt of initial Proof, Liberty receives Proof of continuation of Total Disability.
>
> "In addition, Liberty, at its own expense, may request the Covered Employee to be examined by a Physician chosen by Liberty. After the benefit has been continued for two years under this provision, Liberty will not require an examination more than once a year.
>
> "When Proof of Total Disability has been approved, premiums will be waived beginning the later of:
>
> 1. the date Liberty gives approval; or
> 2. 6 months from the date the Covered Employee is no longer in Active Employment due to Total Disability.
>
> "Accidental Death and Dismemberment and Dependent coverage will not be continued during the Covered Employee's period of Total Disability.

> "The Life Insurance benefit continued under this provision will be the amount in force on the Covered Employee's life under this policy on the date the Covered Employee is no longer in Active Employment due to Total Disability, subject to any reductions provided by any part of this policy."

8. **"Total Disability."** The Policy provides in pertinent part that:

> "With respect to the provision, "Total Disability" or "Totally Disabled" means the complete inability, as a result of Injury or Sickness, to perform the Material and Substantial Duties of Any Occupation."

9. **"Material and Substantial Duties."** The Policy provides in pertinent part that:

> "With respect to the provision, "Material and Substantial Duties" means responsibilities that are normally required to perform Any Occupation, and cannot be reasonably eliminated or modified."

10. **"Any Occupation."** The Policy provides in pertinent part that:

> "With respect to the provision, "Any Occupation" means any occupation that the Covered Employee is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity." [sic!]

11. **The Amount of Coverage.** "The Life Insurance benefit continued under this provision will be the amount in force on the Covered Employee's life under this policy on the date the Covered Employee is no longer in Active Employment due to Total Disability," etc. is $238,000.00.

12. **Relief under ERISA.** ERISA provides in pertinent part that:

> "A civil action may be brought –
>
> (1) by a participant of beneficiary –
>
> (B) to recover benefits due him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the  plan. . . . 29 U.S.C. Sect. 1132(a)(1)(B)."

13. **Ripeness**. Prior to filing the Complaint in the present action Peer fulfilled all conditions precedent to the filing of this action, including having exhausted all administrative remedies. Alternatively, because Liberty failed to provide procedures that meet the

regulatory minimum standards, Peer is deemed, under the view of the Department of Labor, to have exhausted the available administrative remedies:

> "[i]f a plan fails to provide procedures that meet the regulatory minimum standards, the claimant is deemed to have exhausted the available administrative remedies and is free to pursue the remedies available under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim. . . .[a] decision made in the absence of the mandated procedural protections should not be entitled to any judicial deference." (29 C.F.R. Sect. 2560.503-1(k)(1); *See* ERISA, Rules and Regulations for Enforcement; Claims Procedure, 65 Fed.Reg. 70246, 70255-70256.)

14. **Costs and Attorney Fee.** Peer has been forced to retain an attorney to represent her in the present action and is entitled to an award of costs, including a reasonable attorney fee, pursuant to 29 U.S.C. Sect. 1132(g)(1).

15. **Peer is Totally Disabled**. Peer is and has been at all times relevant to this action "Totally Disabled," as defined by the provisions of the Policy, as more fully set forth below.

16. **Liberty Unlawfully Denied Peer's Benefit.** Liberty denied Peer the Waiver of Premium benefit unlawfully, as more fully set forth below.

17. **Peer Requests Relief.** Peer seeks to recover benefits due her under the terms of her Plan, to enforce her rights under the terms of her Plan and to clarify her rights to future benefits under the Plan, including an award of the Waiver of Premium benefit under the terms of the Plan, an Order enforcing her rights to the annual coverage periods and periodic annual reviews provided under the Plan, clarifying Peer's rights to future Waiver of Premium benefits and periodic reviews of continuing Waiver of Premium benefits in accordance with the terms of the Plan on anniversary dates as set forth in the provisions of the Plan, and requiring Liberty to provide Peer a reasonable claims procedure in the future in regard

to the Waiver of Premium benefit which claims procedure meets the regulatory minimum standards as set forth in the claims procedure regulation, 29 C.F.R. Sect. 2560.503-1.

18. **Peer became "Totally Disabled."** While insured under the Policy and before age 60, Peer became "Totally Disabled" as set forth below:

- Peer was forced to stop working due to a disabling condition that rendered Peer "Totally Disabled" in accordance with the terms of the Policy

- Peer's Total Disability continued for the six months following her last date of Active Employment

- Peer's Total Disability under the Policy also met the standards set forth by the Social Security Administration for Disability Insurance benefits

- The Social Security Administration awarded Peer SSDI benefits commencing with the termination of Active Employment in October, 2015

- Peer was deemed disabled and entitled to short- and long-term disability benefits by Liberty

- On April 21, 2016, at the end of the initial 6-month continuing period of Total Disability, Peer saw Craig H. Lichtblau, M.D., Board Certified in Physical Medicine and Rehabilitation and a Fellow of the International Academy of Independent Medical Evaluators, for a re-evaluation follow-up visit. Dr. Lichtblau then examined Peer and performed a Medical Functional Capacity Assessment of Peer, in order to specifically determine Peer's functional restrictions.

- On April 21, 2016, Peer already was a patient of Dr. Lichtblau, who in turn already was one of Peer's treating physicians.

- On April 21, 2016, Dr. Lichtblau reviewed Peer's MRI's once again and discussed Peer's medication regimen with her.

- On April 21, 2016, Dr. Lichtblau performed a physical examination of Peer.

- On April 21, 2016, Dr. Lichtblau noted on Peer's physical examination that:

    Peer remained tender to light palpation along her lumbar paraspinal muscles with palpable muscle spasm present along her lumbar paraspinal muscles bilaterally; active range of motion of her lumbar spine remained limited towards the end range; gait was slow, unassisted; sensation was decreased to her left lateral thigh and dorsal portion of her left foot compared to the right; extensor hallucis longus weakness 4/5 muscle strength.

- On April 21, 2016, Dr. Lichtblau noted his diagnostic impression in detail:

    1. Lumbar myofascial pain syndrome.

    2. Subjective complaints of left leg radiculitis.

    3. History of broad-based L4-L5 left paracentral and foraminal disc protrusion with extruded oblong disc fragment in the anterior aspect of the neural foramen resulting in severe left neural foraminal narrowing and impingement on the exiting left L4 nerve root, broad-based L5-S1 central disc herniation and left foraminal disc protrusion along with hypertrophic changes and moderate left neural foraminal narrowing and anterolisthesis of L3 on L4, grade 1 with degenerative disc changes, as seen on MARI of her lumbar spine performed on 09/01/15.

    4. History of fibromyalgia.

    5. History of depression.

    6. Status post L4-L5 microdiscectomy performed by Dr. Lenard on 12/22/15.

    7. History of L5 radiculopathy with ongoing denervation as seen on EMG/Nerve Conduction Study performed by Dr. Andrea Zotovas

        on 03/21/16.

8. History of T12-L1 disc bulging, L3-L4 disc bulge with annular tear/fissures with facet and ligamenta flava hypertrophy with slight anterolisthesis and moderate central canal stenosis; an L4-L5 disc bulge with facet spurring and left-sided laminectomy with extensive enhancing granulation tissue along the left posterior disc space margin into the left lateral and left posterior thecal sac extending to the laminectomy defect; a left posterior disc herniation with slight impingement on the anterior epidural fat near the S1 nerve roots at her L5-S1 spinal level; and paraspinal posterior soft tissue edema suggesting postoperative changes, as seen on MRI of the lumbar spine with and without contrast performed on 03/30/16.

9. Acute functional decline secondary to chronic pain and depression, secondary to numbers 1 through 8.

19. **Dr. Lichtblau's opinion.** On April 21, 2016, Dr. Lichtblau set forth his opinion in a written "Summary Report," where Dr. Lichtblau noted that:

> "She continued to experience chronic low back pain on a daily basis with radiculopathy to both of her lower extremities. She described her pain as 7 to 8 out of 10 on the 1 - 10 scale for pain. She used no assistive device; however, she walked with a wide-based, slow and guarded gait.
>
> . . . .
>
> "On April 21, 2016 the patient participated in a Medical Functional Capacity Assessment utilizing the BTE Technologies Evaluation System. The patient demonstrated the ability to lift 10 pounds from the floor to waist, 10 pounds from the waist to shoulder, and 10 pounds from the floor to shoulder on an occasional basis. The patient demonstrated the ability to lift and carry 10 pounds for 15 feet (30 feet required for test). There was a close correlation between the patient's subjective complaints of pain, general weakness, general decreased endurance, extremity weakness, fatigue and her functional ability.
>
> "<u>It is my belief that Theresa Peer does not have the functional capacity to work 4 hours per day on an uninterrupted basis at this time.</u>
>
> . . . .
>
> "It should be understood that this patient is going to suffer from acute, intermittent exacerbations of chronic pain and discomfort and, when she experiences these acute, intermittent exacerbations of pain and discomfort, she will have good and bad days.

> "It is my medical opinion, as a Board Certified Physiatrist, this patient will be unable to maintain gainful employment in the competitive labor market or in a sheltered environment with a benevolent employer, secondary to acute, intermittent exacerbations of chronic pain.
>
> "It is my medical opinion this patient has reached Maximum Medical Improvement in regards to conservative care. . . .
>
> "After obtaining a history and performing a physical examination, as well as observing this patient participate in a Medical Functional Capacity Assessment, <u>it is my medical opinion as a Board Certified Physiatrist that, as this patient suffers the secondary effects of aging combined with her current impairment, her disability will actually increase over time</u>." (Emphases added.)

20. **Possible Future Surgery.** Dr. Lichtblau added in his April 21, 2016 Summary Report:

> "It should be understood this patient may require future surgical intervention."

21. **Liberty's Defective Notification of Adverse Benefit Determination.** By letter dated July 14, 2016, Liberty, signed by Maria Aguirre, Life Claims Examiner III, Liberty informed Peer that Liberty had purportedly completed a thorough review of Peer's eligibility for the Waiver of Premium Benefit, stating that Liberty had applied a time period described as "from your last day worked until the present time," a time frame which does not appear accurately to correspond with the actual time period set forth in the Policy.

22. **Liberty's Denial Is Defective.** As Liberty's claim file later revealed, Liberty quoted a paper review performed by Margaret C. Tilton, M.D., for purposes of Peer's ongoing long-term disability (LYD) benefits claim, which is insured under a separate Liberty LTD policy. Dr. Tilton's paper review <u>supported</u> Peer's long-term disability benefits claim under that separate LTD policy. Dr. Tilton did <u>not</u> conduct an examination of Peer. Dr. Tilton concluded that, absent possible further back surgery, Peer was disabled from

8

performing Peer's previous "Light" exertional level occupation and that Peer would likely never regain the ability to perform a Light-level occupation in the future. Dr. Tilton noted that after Peer's December 22, 2015, lumbar surgery Peer had developed a new disc herniation or herniations involving enhancing scar tissue development. Dr. Tilton noted and did not dispute Dr. Lichtblau's opinion that due to acute exacerbations of chronic pain Peer was incapable of working four hours a day on an uninterrupted basis. None of this, however, was communicated by Liberty to Peer in Liberty's July 14, 2016 written notification to Peer denying Peer the Waiver of Premium benefit. In Liberty's July 14, 2016 written notification to Peer Liberty outright ignored Dr. Lichtblau's opinion.

23. **Liberty's Notification**. The July 14, 2016 adverse benefit determination relied exclusively on Dr. Tilton's paper review prepared for Liberty in order to assess the question of whether Peer's medical records supported Peer's claim for long-term disability (LTD) benefits due to Peer's inability to perform her previous Light level occupation.

24. **ERISA's Minimum Regulatory Requirements**. Liberty's July 14, 2016, letter to Peer merely states its conclusion, namely, that Peer's condition was "not of a nature and severity" to preclude Peer from performing the material and substantial duties of any occupation. That letter, however, does not state any specific reason or reasons for that conclusion other than citing part of Dr. Tilton's paper review, which Dr. Tilton had prepared for Peer's long-term disability (LTD) benefits claim under the Group Disability (LTD) Insurance Policy. Liberty's July 14, 2016, letter acknowledges that Peer's LTD benefits are currently approved, but also asserts that the provisions of the Group Life Policy differ from the provisions of the Group Disability policy. Liberty's July 14, 2016,

letter indeed expressly states that: [e]ligibility for LTD benefits does not determine entitlement to *Waiver of Premium* benefits." Because Peer's LTD benefits had been approved, Peer had not yet been provided a copy of Dr. Tilton's memorandum at this point, and Peer was unaware of its contents except those portions quoted in the July 14, 2016, ,Waiver of Premium denial letter.

25. **Liberty's Letter**. Liberty failed in its July 14, 2016, written notification of its adverse benefit determination to explain what additional material or information Liberty might deem sufficient for Peer to submit to perfect Peer's benefit claim. Instead Liberty reversed roles with the claimant and informed Peer that Peer should state any reasons why Peer felt her claim had been incorrectly denied by Liberty. Liberty's July 14, 2016, letter then listed documentation which Liberty referred to as "all office treatment notes, test results," etc., from all treating providers "from April 22, 2016, to the present," etc. Liberty invited Peer to send that material to Liberty. Liberty did not explain why the period "from April 22, 2016, to the present" was mentioned or what relationship, if any, that time period might have had to the six months of continuing Total Disability" referred to in the Policy. Liberty's letter in fact appeared to describe a time period listed which directly conflicts with the provisions of the Policy itself. The Policy's provisions refer to a time period beginning with Peer's last day of work and ending six months later. That period, however, had already ended before April 22, 2016.

26. **Liberty Offers to Provide All Relevant Documents.** Liberty's July 14, 2016, letter to Peer stated: "You may request to receive, free of charge, copies of all documents relevant

to your claim."

27. **Liberty Then Refuses to Provide Peer Relevant Documents.** On August 5, 2016, Peer's undersigned counsel faxed Liberty, to the attention of Maria Aguirre, Peer's written request for relevant documents and claim information. The letter began:

> "This office represents Ms. Peer. You should have on file our notice of representation faxed to Liberty (Elizabeth Kiernan) on March 23, 2016 regarding this office's representation of Ms. Peer regarding both her LTD and life insurance claims.
>
> "Pursuant to ERISA (Employee Retirement Income Security Act), Claims Procedure Regulation, 29 C.F.R. Sect. 2560.503-1 and 29 U.S.C. Sect. 1024(b)(4) please provide this office with the following documents and information for the above referenced claims."

Peer's August 5, 2016, written request requested "all relevant documents and information" and quoted verbatim the claims procedure regulation's pertinent paragraphs, including the regulation's definition of "relevant":

> "Whether a document, record, or other information is relevant to a claim for benefits shall be determined by reference to paragraph (m)(8) of this section."

28. **"Relevant" to a claim for benefits.** Peer's written request quoted paragraph (m)(8):

> "A document, record, or other information shall be considered 'relevant' to a claimant's claim if such document, record or other information:
>
> (i)    Was relied upon in making the benefit determination;
>
> (ii)   Was considered, submitted, or generated in the course of making the benefit determination, without regard to whether such document, reecord, or other information was relied upon in making the benefit determination;
>
> (iii)  Demonstrated compliance with the administrative processes and safeguards required pursuant to paragraph (b)(5) of this section in making the benefit determination; or
>
> (v)    In the case of a group health plan or a plan providing disability benefits, constitutes a statement of policy or guidance with respect to the plan

11

>concerning the denied treatment option or benefit for the client's diagnosis, without regard to whether such advice or statement was relied upon in making the benefit determination." (29 C.F.R. Sect. 2560.503-1(m)(8).)

Peer's August 5, 2016, written request to Liberty for documents, records, or other

information relevant to her claim for the Waiver of Premium benefit also quoted paragraph

(b)(5) of the claims procedure regulation, referred to above, in pertinent part:

>"**Obligation to establish and maintain reasonable claims procedures**. Every employee benefit plan shall establish and maintain reasonable claims procedures governing the filing of benefit claims, notifications of benefit determinations, and appeal of adverse benefit determinations (hereinafter referred to as claims procedures).The claims procedures for a plan will be deemed reasonable only if –
>
>.    .    .    .
>
>"(5) The claims procedures contain administrative processes and safeguards designed ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants." (Sect. 29 C.F.R. Sect. 2560.503-1(b)(5).)

29.   **Peer's August 5, 2016, Request Included a Summary.** Peer's undersigned

counsel included a summary in lay terms for ease of reference:

>"Please not that this request concerns:
>
>A.   Ms. Peer's entire administrative record for her Life Insurance Waiver of premium claim.
>
>B.   A copy of all administrative processes designed to ensure that benefit claim determinations are made in accordance with governing  plan documents.
>
>C.   A copy of all safeguards designed to ensure that benefit claim determinations are made in accordance with governing plan documents.
>
>D.   A copy of all administrative processes designed to verify that

12

        benefit claim determinations have been made in accordance with such safeguards, if any.

    E.    A copy of all safeguards designed to ensure that the plan provisions have been applied consistently with regard to similarly situated claimants.

    F.    A copy of all administrative processes designed to verify that such safeguards (as referenced in the preceding paragraph) have in fact been applied consistently with regard to similarly situated claimants.

"This summary highlights but does not eliminate any of the requirements set forth by the claims procedure regulation quoted above. It is for use in responding to the present written request. If you fail to furnish any of the above or fail to state that they do not exist, please note that this will be taken as conclusive [evidence of] absence of their existence." (Bracketed language added for clarity.)

30. **Liberty's Response.** By letter dated August 8, 2016, Liberty, through Maria Aguirre, Life Claims Examiner, wrote to Peer's undersigned counsel:

"Please provide our office with a letter of representation and authorization specifically for the Group Life Insurance Waiver of Premium referenced above.

"If you have any questions regarding this matter, please contact me."

31. **Peer's Reply**. By fax dated August 9, 2016, Peer's undersigned counsel's office faxed Liberty, to the attention of Maria Aguirre, " a copy of the March 23, 2016, fax sent to Liberty that this office represents Ms. Peer with regard to both her LTD and life insurance claims."

32. **Liberty's Reply.** By letter dated August 10, 2016, Liberty, through Maria Aguirre, Life Claims Examiner, wrote to Peer's undersigned counsel:

"Dear Paul Sullivan:

"We are in receipt of your letter of representation. Please provide our office with an authorization allowing the release of our file to you, specifically for the Group Life Insurance Waiver of Premium claim referenced above, and signed by your

client.

"If you have any question regarding this matter, please contact me."

33. **Peer's Response.**  By fax dated August 15, 2016, Peer's undersigned counsel's office faxed Liberty, to the attention of Maria Aguirre: "Attached is the executed Notice of Representation. Please forward the claim file to our office. Thank you."

34. **Liberty Refuses Peer's Request for Relevant Documents**. By letter dated August 18, 2016, Liberty, through Maria Aguirre, Life Claims Examiner III, acknowledged Peer's undersigned attorney's "letter of representation and request for information." Liberty's letter dated August 18, 2016, enclosed a copy of Peer's Waiver of Premium claim file and a copy of the "applicable NOVO Nordisk Inc. Group Life Policy."  However, Liberty declined Peer's request for documents, records or other information relevant to Peer's benefit claim as defined by regulation, 29 C.F.R. Sect. 2560.503-1(m)(8). Liberty's August 18, 2016, stated, in pertinent part:

> "Dear Paul Sullivan:
>
> .   .   .   .
>
> "With regard to your Page Four Request, enclosed is the administrative record concerning the Waiver of Premium claim and copy of the applicable Policy. However, with regard to your broad requests for administrative processes, safeguards, etc., we do not agree with your interpretation of the scope of Liberty's disclosure obligations under ERISA and we decline your request for this type of information.
>
> "We understand that you are in the process of gathering information to submit when you are ready to file the appeal.
>
> "Pursuant to ERISA regulations, since we are waiting for you to submit necessary information, the days from the date we receive your timely submission of information are not counted as part of the claim determination period.
>
> "As set forth in the denial letter July 14, 2016, under the Employee Retirement

>   Income Security Act, you have a maximum of 180 days from the date your client received the denial letter to submit the appeal and all supporting information that they wish to have considered with the appeal. The 180-day time frame will expire on January 10, 2017. All information that you wish to have considered with your appeal must be submitted by January 10, 2017.
>
>   "If you have any questions regarding this matter, please contact me."

35. **Peer's Appeal.** By fax and priority mail, dated November 15, 2016, Peer, through her undersigned counsel, wrote Liberty, to the attention of Maria Aguirre:

>   "Liberty's written refusal to comply with the Secretary of Labor's claims procedure regulation regarding Liberty's obligation to provide the internal guidelines, etc., which Liberty applied in deciding to deny this claim caught me by surprise.
>
>   . . . .
>
>   "Liberty's decision to decline Ms. Peer's written request 'for this type of documentation' places Liberty prematurely in an adversarial position. Liberty must participate in a non-adversarial dialogue at this stage of the proceedings.
>
>   "Your written refusal to do so implies that a legal argument based on legal advice underlies your refusal to do so. If you have any legal advice, written or otherwise, supporting your stated position, please forward it to me immediately."
>
>   "Any legal opinion or advice obtained in regard to the administrative review of the decision is not subject to any privilege and must be produced at this time."

Peer's November 15, 2016, letter quoted the claims regulation verbatim, requiring that the claims procedures of a plan establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination. A reasonable opportunity for a full and fair review of the claim and the adverse benefit determination will not be deemed to have been provided to a claimant, unless the claims procedures provide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the

claimant's claim for benefits. Whether a document, record, or other information is relevant to a claim for benefits shall be determined by reference to paragraph (m)(8) of this section. Peer's November 15, 2016, letter continued:

> "Ms. Peer's written request quotes the above verbatim as well as paragraph (m)(8)(i)-(iv) of the claims procedure regulation. With the possible exception of 'claims manuals,' which references recent ERISA case law, Ms. Peer's written request merely repeats the words found in the regulation.
>
> "My August 5, 2016 letter interprets nothing. It quotes the regulation."

36. **Peer Quoted the Regulation**. In Peer's November 15, 2016, letter to Liberty quoted the text of the claims procedure regulation which requires Liberty to set forth in Liberty's written notification of an adverse benefit determination in a manner calculated to be understood by the average claimant, as follows:

> "If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse benefit determination and that a copy of such rule, guideline, protocol, or other similar criterion will be provided free of charge to the claimant upon request." (See 29 C.F.R. Sect. 2560.503-1(g)(1), (v)(A).)

37. **Peer Enclosed Case Law.** Peer enclosed in her November 15, 2016, letter to Liberty a copy of the Order by Judge Patricia A. Seitz, U.S. District Judge, holding that the disability claims manual of Aetna Life is discoverable, because it may be relevant in demonstrating procedural misconduct by Aetna. (*See Agrifolio v. Aetna Life* (S.D. Fla., August 14, 2016).

38. **Liberty unduly inhibited or hampered the processing of Peer's benefit claim**. Peer's November 15, 2016, letter Peer directly accused Liberty of administering the claims

procedures of the plan in such a way as to unduly inhibit or hamper the processing of Peer's benefit claim by challenging Peer's right to request such documents and claim information as set forth in paragraphs numbered 2 and 3 of Peer's August 5, 2016 written request, in violation of 29 C.F.R. Sect. 2560.503-1 (b)(3).

39. **Peer's Summary**. Peer's November 15, 2016, letter to Liberty pointed out that Peer's so-called "Page Four Request" merely summarized in convenient, easy to understand lay terms the previous requests in Ms. Peer's August 5, 2016, written request for documents, etc. It added nothing but made the earlier requests more readable for the average lay person charged with providing the requested information. As such, Liberty's refusal to provide such information was in violation of 29 C.F.R. Sect. 2560.503-1 (b)(3).

40. **Peer Fulfilled the Definition of "Totally Disabled."** Peer's November 15, 2016, letter to Liberty demonstrated that Peer fulfilled the definition of "Totally Disabled" under the Group Life Policy. Peer further stated that Liberty's July 14, 2016, letter to Peer denying her Waiver of Premium benefit claim made no mention of the apparently applicable Policy provision, e.g., the date when Peer was no longer in Active Employment. Peer pointed out that "initial Proof" refers to Proof that the Covered Employee's Total Disability had continued for 6 months. The "present time" referred to in Liberty's July 14, 2016, denial letter, however, bore no reference to the relevant time period mentioned in the Policy. Indeed, Liberty had given no consideration to whether Peer was Totally Disabled during the relevant 6-month time period.  Moreover, once approved, Peer's scheduled review was to take place within the three months preceding the anniversary following the date of Liberty's receipt of Peer's "initial Proof."  Liberty acknowledged its receipt of Peer's

initial Proof in Liberty's July 14, 2016, written notice of adverse benefit determination.

41. **Dr. Lichtblau Opines Peer Cannot Maintain Gainful Employment**. Peer's November 15, 2016, letter to Liberty set forth Dr. Lichtblau's opinion that "secondary to acute, intermittent exacerbations of chronic pain" Peer will be unable to maintain gainful employment in the competitive open labor market or in a sheltered environment with a benevolent employer." Dr. Lichtblau, moreover, is both Peer's treating physician and a credentialed disability evaluator.

    Dr. Lichtblau opined on April 21, 2016 : "It is my belief that Theresa Peer does not have the functional capacity to work 4 hours per day on an uninterrupted basis at this time."

42. **An Employee Who Cannot Sit for More than Four Hours in an Eight-Hour Workday Cannot Perform Sedentary Work**. Peer argued in her November 15, 2016, appeal letter to Liberty that the 9th Circuit expressed agreement with the common-sense conclusion already articulated by other courts that an employee who cannot sit for more than four hours in an eight-hour workday cannot perform "sedentary" work. Sedentary work requires "sitting most of the time." Peer enclosed a copy of that case, *Armani v. Northwestern Mut. Life Ins. Co.*, 2016 U.S. App. LEXIS (9th Cir. Nov. 4, 2016) with her appeal.

43. **Peer Attached Dr. Lichtblau's Comprehensive Rehabilitation Evaluation**. Peer enclosed a copy of Dr. Lichtblau's April 21, 2016, Comprehensive Rehabilitation Evaluation in her November 15, 2016, appeal to Liberty and quoted Dr. Lichtblau's findings in her letter to Liberty.

44. **Liberty Denies Peer's Appeal**. By letter dated January 23, 2017, through Jane Daniell,

  Disability Claims Tech Spec, Liberty denied Peer's appeal after review by a disability nurse case manager.

45.  **Liberty Unlawfully Denied Peer the Waiver of Premium Benefit**. For the reasons stated above, Peer is entitled to recover the Waiver of Premium benefit due her under the terms of the Plan and Policy, to enforce Peer's rights under the terms of her Plan and Policy and to clarify her rights to future Waiver of Premium benefits under the Plan and Policy, including the award of the Waiver of Premium benefit under the terms of the Plan and Policy, an Order enforcing Peer's rights to the annual coverage periods and periodic annual reviews provided for under the Plan and Policy, clarifying Peer's rights to future Waiver of Premium benefits and periodic reviews of continuing Waiver of Premium benefits in accordance with the terms of the Plan and Policy on the successive anniversary dates set forth in the provisions of the Plan and Policy, and requiring Liberty to provide Peer a reasonable claims procedure in the future with regard to Peer's Waiver of Premium benefit claim, namely, a claims procedure which meets the regulatory minimum standards set forth in the claims procedure regulation, 29 C.F.R. Sect. 2560.503-1.

46.  **Attorney Fee Award**.  For the reasons stated above, Peer is entitled to an award of costs, including a reasonable attorney fee, pursuant to 29 U.S.C. Sect. 1132(g)(1).

  **Wherefore**, Peer requests an award of the Waiver of Premium benefit due her under the terms of the Plan and Policy, an Order enforcing Peer's rights under the terms of her Plan and Policy and clarifying Peer's rights to future Waiver of Premium benefits under the Plan and Policy, including periodic reviews of continuing Waiver of Premium benefits in accordance with the terms of the Plan and Policy on the applicable anniversary dates as set forth in the provisions

of the Plan and Policy, requiring Liberty to provide Peer a reasonable claims procedure in the future in regard to Peer's Waiver of Premium benefit claim, which claims procedure meets the regulatory minimum standards as set forth in the claims procedure regulation, 29 C.F.R. Sect. 2560.503-1.  Peer further requests an award of costs, including a reasonable attorney fee, pursuant to 29 U.S.C. Sect. 1132(g)(1).

>PAUL M. SULLIVAN, JR.,
>ATTORNEY AT LAW, P.A.
>4440 PGA Blvd., Suite 600
>Palm Beach Gardens, FL 33410
>(561) 689-7222
>(561) 689-5001- Fax
>Email: sullivanpaul01@gmail.com
>Email: psulliv@bellsouth.net (Court Filings Only)
>
>By: *s/Paul M. Sullivan, Jr.*
>        Paul M. Sullivan, Jr.
>        FL Bar Number: 223891